## UNITED STATES FIDELITY & GUARANTY CO. v. TITLE GUARANTY & SURETY CO. OF SCRANTON, PA.

(District Court, D. Maryland.   November 1, 1912.)

1. STATES (§ 122*)—COLLECTION AND CUSTODY OF FUNDS—CONSTRUCTION OF KANSAS STATUTE.

Prior to 1891, the statutes of Kansas prohibited the State Treasurer from receiving in payment of claims or dues to the state anything except specie, treasury or national bank notes, or postal money orders, and made it embezzlement for him to deposit state funds in any bank.   By Laws 1891, c. 41, §§ 1, 2 (Gen. St. 1901, §§ 7629, 7630), county treasurers were authorized to make settlements with the State Treasurer, among other ways, by certificates of deposit or drafts on banks.   The act further authorized the State Treasurer, with the advice and approval of the executive council, to designate one or more banks in Topeka as a depository for the collection of any drafts, checks, or certificates of deposit that might come into his hands on account of any claim due the state, and required a bank so designated to give bond for the prompt collection of all drafts, checks, and certificates of deposit that might be delivered to it by the treasurer for collection and for the safe-keeping and prompt payment of the proceeds on the Treasurer's order.   *Held*, that such statute, while an amendment of the revenue law, could not be so narrowly construed as to make it unlawful for the Treasurer to deposit for collection drafts or checks which he received for payments due the state from others than county treasurers, but that, while he could not be compelled to accept such paper, he might lawfully receive it and deposit it for collection.

[Ed. Note.—For other cases, see States, Cent. Dig. § 121; Dec. Dig. § 122.*]

2. SUBROGATION (§ 2*)—RELATIVE LIABILITIES OF PARTIES AS TO DEBT DISCHARGED.

When it is sought to exercise the right of subrogation, something more must be shown than that defendant could have been compelled by the principal creditor to pay to him the debt which complainant has paid. It must be further shown that as between complainant and defendant it is the latter, and not the former, who in equity should bear the loss.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. § 3; Dec. Dig. § 2.*]

3. SUBROGATION (§ 2*)—RELATIVE LIABILITIES OF PARTIES AS TO DEBT DISCHARGED—SURETIES FOR DIFFERENT PRINCIPALS.

Defendant was surety on the bond of the State Treasurer of Kansas, conditioned that he should faithfully discharge his duties and account for and pay over all moneys coming into his hands by virtue of his office.   Complainant was surety on the bond of a depository bank, with which the Treasurer was authorized to deposit drafts, etc., for collection, conditioned that it should faithfully keep and pay over on order of the Treasurer the proceeds of all collections.   The bank failed, and complainant was compelled to pay to the state a balance due from the bank on account of such collections.   Complainant claimed that some of the paper so collected was illegally deposited by the Treasurer.   *Held* that, conceding such claim as between the two sureties, both of which were innocent, the loss must fall on the one whose principal's fault was the proximate cause of such loss, and that, since the illegal act of the Treasurer would have resulted in no loss, but for the subsequent default of the bank, such default was the proximate cause, and, while complainant

might have recovered from the treasurer, it was subrogated to no equity to recover over from defendant.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. § 3; Dec. Dig. § 2.*

Nature and theory of right of subrogation, see note to Merchants' & Miners' Transp. Co. v. Robinson-Baxter-Dissosway Towing & Transp. Co., 113 C. C. A. 434.]

In Equity. Suit by the United States Fidelity & Guaranty Company against the Title Guaranty & Surety Company of Scranton, Pa., formerly the Title Guaranty & Trust Company. On demurrer to bill. Demurrer sustained.

J. Kemp Bartlett, of Baltimore, Md., for complainant.
Charles F. Harley, of Baltimore, Md., for defendant.

ROSE, District Judge. The United States Fidelity & Guaranty Company is the complainant. It is a Maryland corporation. The Title Guaranty & Surety Company of Scranton is the respondent. It is incorporated under the laws of Pennsylvania.

The complainant was surety on a bond given by the First National Bank of Topeka to the state of Kansas. The bond recited that the Treasurer of the state, by and with the consent of its executive council, had designated the First National Bank of Topeka a depository for the collection of drafts, checks, or certificates of deposit which might come into his hands on account of *any* claim due the state. It was conditioned that the bank should promptly collect all drafts, checks, and certificates of deposit that might be delivered to it by the Treasurer for collection, and should safely keep the proceeds of all such collections, and should promptly pay the same upon the Treasurer's order. On July 3, 1905, the Treasurer's official balance in the bank exceeded $547,000. On that day the Comptroller of the Currency put the bank into receiver's hands. The state collected from the receiver the larger part of the money due it. It sued the complainant in its own courts for the balance. It recovered judgment therefor. This judgment complainant paid.

The respondent was surety on the bond of the State Treasurer. That bond was conditioned that he should faithfully discharge his official duties and pay over and account for all moneys that might come into his hands by virtue of his office.

By its bill in this case complainant seeks to recover from the respondent $108,752.51, the net amount paid by it to the state, with interest thereon from April 14, 1910, the date of such payment. It says that the state's money in the bank when it closed its doors had been put there by the Treasurer in violation of law. If he had not done what the law forbade him to do, the money would not have been in the bank and could not, therefore, have been lost by it. Complainant has been forced to make good the loss suffered by the state as a result of the Treasurer's breach of official duty. For the consequence of such a breach the respondent is liable to the state of Kansas. Complainant is entitled to be subrogated to the rights of

the state, and to require respondent to reimburse to it the sum which it was compelled to pay the state.

Respondent denies that the complainant has any claim upon it. It demurred to the bill of complaint.

[1] It is the contention of the complainant that the Treasurer could not lawfully receive any checks or drafts except those sent him by county treasurers in payment of taxes due the state, and that he was bound to withdraw from the bank the proceeds of every check or draft so soon as the bank had made the collection. It says that he actually did receive from many other persons than county treasurers, and for many debts due the state other than for taxes, checks and drafts; that he deposited such checks and drafts with the bank. The official account he kept with the bank was treated by him and it as an ordinary commercial account; that he made no attempt to withdraw the proceeds of a check or draft when the same was paid, but left such proceeds in the bank indefinitely, having his account balanced from time to time precisely as any ordinary customer of the bank would have done. If he had deposited nothing in the bank except checks received from county treasurers for taxes, and had withdrawn the proceeds of such checks so soon as collected in cash, and had put that cash in the state vaults, there would have been no state money in the bank when it closed its doors. The contention of complainant rests upon the construction it puts upon the statutes of the state.

A state, like an individual, may prefer to keep its money in its own strong box, instead of depositing it in bank. For many years such was the policy of Kansas. Its statutes declared that all payments to the state should be made in either gold or silver, treasury notes of the United States or national bank notes, or United States post office money orders. They required the Treasurer to keep in the state treasury, without loaning, using, or depositing it in banks or elsewhere, all public money of whatsoever character paid into the treasury or otherwise, and at any time placed in his possession and custody as State Treasurer. For him to deposit any part of the public moneys with any company, corporation, or individual was embezzlement. General Statutes of Kansas 1901, §§ 7251, 7263, 7267.

This policy is not novel. Nor are the statutory provisions unusual. Since 1846 the federal government has had its independent treasury. The Kansas statutes above cited were obviously modeled upon acts of Congress. Sections 16, 18, 19, chapter 90, Act approved August 6, 1846, 9 Statutes at Large, 59; Rev. St. §§ 3651, 5490 (U. S. Comp. St. 1901, pp. 2626, 3704).

If Kansas had not used the banks at all, this case could not have arisen. There would have been no occasion for such a bond as that given by complainant. Years ago, however, the state found it expedient to avail itself to some extent of the facilities furnished by the banks. As early as 1876 county treasurers in some counties were authorized to deposit the county funds in bank, and by 1887 all county treasurers were required so to do. Acts of 1876, c. 78; Acts of 1887, c. 131.

Until 1891, however, such treasurers were required twice a year to settle their accounts with the State Treasurer by the payment in actual cash of the balances due by them to the state. They were expected to make the trip to the State Capitol in person and to bring the money with them. They were allowed mileage to cover their expenses in so doing. After the state had directed them to keep the public money in bank, it became obvious that such trips wasted time and exposed the public funds to risk of loss through accident or theft. Accordingly in 1891 the Legislature authorized county treasurers to make their semiannual settlements in legal currency, by express at the expense of the state, or by mail at their risk, in post office money orders, express money orders, state warrants, matured coupons, certificates-of deposit, or drafts on banks. The collection of the certificates of deposit, checks, and drafts was to be at the risk of county treasurers remitting them. Acts of 1891, c. 41, § 1; General Statutes 1901, § 7629.

If the State Treasurer had to take checks and drafts, he must have some way of collecting them. The same act therefore authorized him, with the advice and approval of the executive council, to designate one or more banks in the city of Topeka as a depository for the collection of *any* drafts, checks, and certificates of deposit that might come into his hands on account of *any* claims due the state. A bank so designated was required to give security to the state for the prompt collection of *all* drafts, checks, and certificates of deposit that might be delivered to it by the State Treasurer for collection, for the safe-keeping and prompt payment on the Treasurer's order of the proceeds of all such collections, and for the payment of all drafts that might be issued to such Treasurer by such bank. General Statutes 1901, § 7630. It was under the provisions of this statute that complainant became surety on the bond of the bank. Its undertaking was conditioned in the very words prescribed by the statute.

Complainant says that the act of 1891 was avowedly an amendment of the taxation laws of the state. It is true it authorizes the deposit of *any* drafts, checks, and certificates of deposit that may come into the Treasurer's hands on account of *any* claims due the state. In view, however, of its purposes, the checks and drafts referred to must have been those which were to be received from county treasurers for taxes, and those only. After the passage of this act, as before, the State Treasurer could not receive from any one except county treasurers, and from them only when remitting taxes due the state, anything except gold or silver, treasury notes of the United States, national bank notes, or post office money orders.

Complainant further contends that when the State Treasurer received a check for taxes from a county treasurer he could deposit it for collection, and for collection only. That means, in complainant's understanding, that it was the duty of the Treasurer, so soon as a depository bank had actually collected the check, to draw the proceeds out of the bank in currency and lock them up in the state vaults.

The construction which complainant would put upon the legislation of the state is a narrow one. While the act of 1891 was an amendment of the taxation laws, its language seems to assume that it was possible that other checks than those remitted by county treasurers might come into the State Treasurer's hands. He is authorized to deposit for collection all checks, etc., which come into his hands. It is possible that a state Legislature thought that debtors of the state other than county treasurers might send checks in payment. If they did, the Treasurer was not bound to receive them. If he did take them, he might be responsible for any loss to the state which thereby resulted. No debt due the state was extinguished until a check or draft given for it was paid. Under such circumstances, what was a State Treasurer to do when he received a check for a sum due the state? Did he violate any law by depositing it in the bonded bank and having it collected in due course? Did he not safeguard the state's interests in that way, at least as certainly as he would have done had he mailed the check back and told the maker that he must bring or send the actual cash to the Treasurer's office? In terms the obligation voluntarily assumed by the complainant is broad enough to cover any checks, drafts, or certificates of deposit deposited by the State Treasurer with the bank for collection.

The construction which the Supreme Court of Kansas puts upon the laws of that state is, of course, binding on this court. It has held that the law does not require the State Treasurer to withdraw the proceeds of each check or draft deposited by him for collection so soon as such collection has been made. State v. U. S. Fidelity & Guaranty Co., 81 Kan. 660, 106 Pac. 1040, 26 L. R. A. (N. S.) 865.

Assuming, however, that the construction which the complainant puts upon the Kansas statutes is sound, has the complainant any claim against the respondent?

The counsel for the parties to this cause have with industry and ability discussed the doctrine of subrogation in its various phases and aspects. Into this discussion it will not be necessary to follow them. It will be assumed that the right is broad enough to include every instance in which one person is compelled to pay a debt which in justice, equity, and good conscience ought to be paid by another. It will be taken for granted that equity will surmount all obstacles, whether of substantive law or of procedure, which stand in the way of making that person pay the debt who in the last analysis should discharge it.

[2] There is but one question to be considered. Is there any reason why, in a court of conscience, the respondent should be required to make good complainant's loss? Complainant says that, if Kelly had obeyed the law of Kansas, the state would have had no money in the bank when it failed. Respondent had bound itself that Kelly should faithfully discharge his duties, and should pay over and account for all moneys which came into his hands by virtue of his office. He did not do what the law said he should do. He certainly did not pay over

to the state all its funds which had come into his hands. **If the state** had not already been reimbursed by complainant, it could compel the respondent to make good its loss. If the state could do so, the complainant says it can, because it is subrogated to the state's rights. That does not necessarily follow. The Supreme Court of Kansas has held that the complainant was liable to the state. If the respondent had been in the first instance forced to pay the state, it would have had the same right of subrogation that the complainant now claims. When it is sought to exercise the right of subrogation, something more must be shown than that the defendant could have been compelled by the principal creditor to pay the debt to it. It must appear that, as between complainant and respondent, it is the latter and not the former which in equity should bear the loss.

[3] In this case respondent says that, even upon the assumption that the Treasurer did that which he should not have done, and left undone that which he should have done, yet, nevertheless, neither that which he did nor that which he left undone was the proximate cause of the loss. Whether the state's money came into the bank legally or illegally, from the standpoint of the bank made no difference. It could safely keep money unlawfully deposited with it. It might waste or lose funds properly committed to its keeping. The immediate cause of the loss in this case was not the way in which the money went into the bank, but the fact that it got out of the bank into hands other than those to whom it belonged. It makes no difference from this point of view that the Treasurer's action in depositing the money or some of it in the bank might have under the statutes of Kansas constituted embezzlement. If it did, it might be that he would have had to undergo the penalty prescribed by the laws of that state for that offense. None the less the bank would have been bound to pay the money over to the state. This the bank's surety does not deny. It contends, however, that if the bank had given surety and the Treasurer had not, and the Treasurer was solvent and the bank was not, the bank's surety, had it been compelled to pay, could have recovered the money back from the Treasurer. Unquestionably, because the Treasurer and the bank would have been knowingly and jointly engaged in violating the law. The surety for the bank had no part in such offending, yet it lost by it. It could have made either of the parties who had broken the law to its hurt make good the loss it suffered. It is not worth while to inquire whether he would have been held liable because the surety was subrogated to the rights of the state against him, or whether his liability was placed on the still simpler principle that he had knowingly done an illegal thing which had resulted to the surety's damage as he might reasonably have anticipated that it would so result.

The bank's surety says that the Treasurer's surety stands in the same relation to it as does the Treasurer. That does not follow. The Treasurer's surety has not knowingly participated in any violation of law. Both the sureties are entirely innocent. Both the principals, on the allegations of the bill and the assumption of the complainant as to

what the law of Kansas was, are guilty. The state could have held both the principals and both the sureties. Either surety could have held both or either of the principals for anything it had been compelled to pay in consequence of their breach of law. Under such circumstances the loss must fall upon that one of the sureties whose principal's default was its proximate cause. All the illegal things which the Treasurer is said to have done might have been done without causing any one to lose a penny, had the bank kept the money which he deposited with it and paid it to the state upon demand.

The cases relied on by complainant have been carefully considered. In none of them are the facts similar to those set up in the bill. In many of them a surety who has paid the loss has been allowed to recover from some one with whom it had no contractual relation, but who had knowingly participated in the illegal act which brought about the loss. Such is the case of American Bonding Co. v. National Mechanics' Bank, 97 Md. 598, 55 Atl. 395, 99 Am. St. Rep. 466, and many others cited by complainant. The case most relied on by the complainant is National Surety Co. v. State Savings Bank, 156 Fed. 21, 84 C. C. A. 187, 14 L. R. A. (N. S.) 155, 13 Ann. Cas. 421. Upon the facts that case was a close one, as was evidenced in the division of the court itself. It is sufficient for the present purpose that the majority of the court upheld the liability of the State Savings Bank on the distinct ground that the loss had resulted from the "culpable negligence" of the defendant. The surety, the plaintiff in the case, was entirely innocent. There is no suggestion in this bill of any negligence on the part of the respondent, nor could there well have been.

Complainant makes one other contention. It says that the law authorizing the State Treasurer to make any deposits at all in the bank was repealed on the 18th of March, 1905, and that in spite of such repeal the Treasurer thereafter deposited nearly $100,000 in the bank. For this sum it says it was not liable. The bill does not disclose how or upon what principle the complainant was held liable by the courts of Kansas for money deposited by the Treasurer after the law authorizing such deposit had been repealed. An examination of the case already cited of State v. United States Fidelity & Guaranty Co., in 81 Kan. 660, 106 Pac. 1040, 26 L. R. A. (N. S.) 865, shows that in point of fact complainant was not held responsible for any sum so deposited. Technically it may be objected that upon demurrer this court is not entitled to take judicial cognizance of what was decided on the matters of fact involved in the case cited. The contention may be sound, although what was decided is clearly stated in an opinion to which both parties necessarily made reference for a construction of the laws of Kansas involved in this case. The bill itself, however, does not distinctly charge that the complainant was compelled to pay the state any part of the money deposited after the repeal of the statute authorizing the deposit. It is, indeed, said that of the amount on deposit at the time the bank closed its doors nearly $100,000 was the money which had been placed in the bank after the repeal. But in the portion of

the bill which purports to tell why it was that the courts of Kansas held it liable to the state it is nowhere said that it was held liable for any sums deposited after the law under which its bond was given had been repealed. Such allegations were doubtless not made simply be-cause it would have been impossible to make them, in view of the fact that the Supreme Court of Kansas had distinctly decided that the re-spondent had not been held liable for any moneys deposited after that date.

For the reasons already stated, the demurrer will be sustained.